## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| IDA M. JOHNSON, | ) | CASE NO. 8:05CV216 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | MEMORANDUM |
| | ) | AND ORDER |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

This matter comes before the Court on the denial, initially and on reconsideration, of the Plaintiff's disability insurance ("disability") benefits under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433. The Court has carefully considered the record and the parties' briefs (Filing Nos. 11, 12).

### PROCEDURAL BACKGROUND

The Plaintiff, Ida M. Johnson, filed her initial application for disability benefits on November 19, 2002. (Tr. 62-64.)[1] The claim was denied initially (Tr. 30-31) and on reconsideration (Tr. 32-34). An administrative hearing was held before Administrative Law Judge ("ALJ") James M. Mitchell on April 30, 2004 (Tr. 231-72). On November 20, 2004, the ALJ issued a decision finding that Johnson was not "disabled" within the meaning of the Act and therefore is not eligible for disability benefits. (Tr. 26.) On March 26, 2005, after considering additional evidence (Tr. 10), the Appeals Council denied Johnson's request for review. (Tr. 7-9.) Johnson now seeks judicial review of the ALJ's determination

---

[1]Johnson filed a prior application for Title II benefits on April 23, 2002. (Tr. 59-61.) The application was denied on June 3, 2002. (Tr. 29, 35-38.)

as the final decision of the Defendant, the Commissioner of the Social Security Administration ("SSA").  (Filing No. 1.)

Johnson argues that the ALJ's decision was incorrect because the ALJ erred in: 1) failing to set out inconsistencies in the record supporting the ALJ's opinion that Johnson is not credible; 2) not finding that Johnson's daily activities are significantly restricted; 3) finding that Johnson can perform full-time work; 4) finding that the opinion of Johnson's treating physician, Dr. Nicholas Steier, is not supported by the record; and 5) rejecting the opinion of Johnson's expert, David Utley, that Johnson is unable to work.

Upon careful review of the record, the parties' briefs and the law, the Court concludes that the ALJ's decision denying benefits is supported by substantial evidence on the record as a whole.  Therefore, the Court affirms the Commissioner's decision.

## FACTUAL BACKGROUND

Johnson is now fifty years old.  (Tr. 234.)  She attended college and vocational training.  (Tr. 234-35.)  Johnson's most recent occupational experience includes work as a social worker, assistant social worker, and typist/receptionist. (Tr. 237-38.) Since March 7, 2001, Johnson has not engaged in any substantial gainful employment.  (Tr. 235.)

### Johnson's Testimony

At the hearing, Johnson testified to her educational background, which includes vocational training in the 1970s and at least three years' part-time college.  However, she did not receive a certificate, license or degree.  (Tr. 234-35.)  From 1994 until March 7, 2001, Johnson was a social worker performing primarily customer service duties.  (Tr. 237-38.) Between 1991 and 1993, she worked as an assistant social worker, and she assisted claimants by taking them to the doctor or the store.  Between 1989 and 1991, Johnson

2

worked as a typist/receptionist performing clerical duties.  Between 1989 and 2001, Johnson worked for the same company.  (Tr. 238-40.)  Johnson testified that she has not worked since March 7, 2001, due to "[t]otal body pain from head to toe."  (Tr. 235.)  She testified that she resigned from her last position because of her carpal tunnel syndrome and herniated disk.  (Tr. 241, 243.)  Since then Johnson applied for clerical and office work, but she was not hired.  (Tr. 236.)

Johnson stated that she suffers from pain in her hands, fingers, arms, neck, back, legs, feet, and her whole body.  She also said that she suffers from heart palpitations and headaches.  (Tr. 242.)

Johnson testified that she lives in her home with her husband and two children aged eight and ten at the time of the hearing.  (Tr. 243, 244.)  She prepares meals generally once daily, grocery shops once a week with family members, and watches television and sleeps on the couch on and off the "whole day."  (Tr. 244-46, 247, 250.)  She reads approximately one hour daily.  (Tr. 246.)  Visitors come for about one hour per week.  (Tr. 247.)  She sometimes pays bills, but otherwise performs no indoor or outdoor household chores.  (Tr. 245-46, 247, 248.)  Johnson goes to church on her own once weekly.  About three to five times per week she leaves the house to pick up mail, go to the corner store, or walk around the building.  (Tr. 248.)  Johnson drives once or twice per week within a five-mile radius of her home to the store or her daughter's house.  (Tr. 249.)   Johnson testified that she helps the rest of her family care for her three-year-old granddaughter two days per week.  (Tr. 249, 261, 264.)  Johnson is paid between two and three hundred dollars per month through a state program for caring for this child.  (Tr. 260.)

3

Johnson stated that she has seen Dr. Nicholas Steier, her primary care physician, twice during the last twelve months.  (Tr. 250.)  Johnson testified that she can stand between twenty and thirty minutes, sit for the same amount of time, and walk between one-third to one-half of a block.  She can put on her socks and shoes, and she has no difficulty reaching.  (Tr. 253.)  She dresses and bathes herself.  (Tr. 258.)  She does not have trouble picking up objects such as pens, pencils, and eyeglasses, but she has difficulty holding on to them because of pain in both hands.  She also has difficulty gripping a pen or pencil due to "burning" pain.  (Tr. 254.)  Johnson testified that she has pain when she turns her head.  (Tr. 255.)  She describes her main complaint as "[t]otal body" pain "all the time."  (Tr. 256, 261.)  When asked specifically which areas hurt, Johnson responded with both hands, both legs, both feet, both arms, toes, neck, upper and lower back.  (Tr. 256.)  She stated that she experiences burning, tingling, numb, sharp, dull and achy pain daily.  (Tr. 256-57.)  She described the level of pain as moderate to above moderate.  Johnson stated that she has tried several medications, and none help her pain.  (Tr. 257.)  Johnson testified that she is 5'4 ½" tall and weighs 225 pounds.  She does not exercise.  (Tr. 258.)

***Vocational Expert's Testimony***

Testimony was also heard from a vocational expert ("VE"), Sandra Trudeau, under contract with the Social Security Administration ("SSA").  (Tr. 54-57.)  The VE testified that, an individual of Johnson's age, education and experience who could lift, push, and pull ten pounds occasionally, five pounds frequently, walk, stand, stoop and bend occasionally, and sit frequently would be able to perform Plaintiff's past work as an eligibility worker or a receptionist typist.  The individual would also be able to perform

4

other jobs existing in significant numbers in the national economy, including those of government service worker, receptionist typist, cashier, and interviewer.  At the time of the hearing, approximately 1,500 government service worker positions, 6,700 receptionist typist positions, 6,600 cashier positions, and 1,200 interviewer positions existed in the national economy.  (Tr. 269.)

**Documentary Evidence Before the ALJ**

In addition to oral testimony, the ALJ considered medical evidence.  The evidence shows that on January 16, 2001, Johnson saw her primary care doctor, Dr. Nicholas Steier, for right leg pain.  The examination was normal except for a hamstring strain.  (Tr. 206.) On October 5, 2001, laboratory testing revealed a sedimentation rate[2] of 56 millimeters per hour (mm/hr), with a reference range of up to 20 mm/hr.  (Tr. 200.)

On November 6, 2001, Johnson complained of heart palpitations.  However, tests indicated a "normal" sinus rhythm throughout.  (Tr. 195.)  An echocardiography report also showed "normal" ventricular size and systolic function, "trace to mild tricuspid regurgitation with upper end normal pulmonary artery systolic pressure estimate."  (Tr. 193.)   The atriums and the aortic and mitral valves were all "normal."  (Tr. 194.)

On May 22, 2002, Johnson saw Steven A. Schwid, M.D., for a consultative examination.   (Tr. 144.)   Johnson was cooperative, coordinated, well-groomed, in no

---

[2]Erythrocyte sedimentation rate is a nonspecific screening test which can be used to monitor inflammatory or malignant disease.  The normal value for a woman under 50 years old is less than 20 mm/hr, and the normal value for a woman over 50 years old is less than 30 mm/hr.  See Medline Plus, The U.S. National Library of Medicine and the National Institutes of Health,  at http://www.nlm.nih.gov/medlineplus/ency/article/003638.htm.

distress, and was able to move on and off of the examination table independently.  She was obese, but her peripheral pulses were full and no swelling existed.  Her cranial nerves were intact except for vision in the left eye, with which she was only able to count fingers and distinguish light from dark.  The neck was supple and without masses or abnormal sounds.  (Tr. 147.)  Cardiac examination revealed normal heart tones, with no murmurs, rubs, clicks, or gallops.  (Tr. 148.)  Testing revealed a decreased range of motion in the neck, spine, elbows, and knees.  (Tr. 150-51.)  There was no spasm or atrophy of the muscles of the trunk or limbs, her station and gait were independent, there was no crepitus or instability in the knees, and Johnson had sufficient manual dexterity for the daily activities.  Dr. Schwid summarized that Johnson had systolic and diastolic hypertension, was "morbidly" obese, and had visual loss in the left eye.  He noted that the cause of her complaints of breast sensitivity, nausea, and palpitations was uncertain.  (Tr. 149.)

On May 28, 2002, Johnson complained of right arm pain and a fast heart beat.  She also noted pain in her legs, arms, hands, back, and neck, as well as nausea, dizziness, and numbness in her hands and right leg.  Examination revealed only a decreased range of motion in the right elbow, and a rheumatology evaluation was suggested.  (Tr. 191.)

On June 10, 2002, Johnson saw a rheumatologist, Michael Thakor, M.D., for an arthritis evaluation.  (Tr. 161.)  Johnson complained of constant pain, stating that she "just live[d] with" pain because she did not like to take medications.  (Tr. 164.)  Examination revealed normal heart rate and rhythm, and "mild" tenderness in the shoulders, elbows, wrists, fingers, hips, and spine.  (Tr. 163.)  Dr. Thakor's impression was that Johnson's pain was attributable to fibromyalgia as he had not found any hard evidence of an inflammatory process.  He stressed the importance of a mild aerobic exercise program and

6

prescribed Trazodone, an antidepressant medication also used to treat chronic pain.  (Tr. 161.)

On December 18, 2002, Johnson was seen by Chad W. Vokoun, M.D., for aches and pains in her joint muscles and numbness in her hands.  (Tr. 166.)  Johnson reported that she did not exercise and that she provided part-time daycare in her home for her granddaughter.  (Tr. 167.)  Examination revealed that she was obese and cooperative, appeared healthy, comfortable, "normal and upbeat."  (Tr. 168.)  Johnson sat throughout for the twenty-minute examination, but she had difficulty getting up out of the chair and on and off the table.  Her blood pressure was 140/90.  (Tr. 168.)  Her neck was supple, and heart rate and rhythm were regular with a "small" I to II/VI systolic murmur, but was without rubs, gallop, or clicks.  (Tr. 168-69.)  The curvature of her spine was "normal," but she had tenderness in the paraspinal muscles, and her range of motion was diminished.  She was tender to palpation of the left wrist, but the remainder of the extremities showed no swelling, tenderness, spasm, erythema, warmth, or evidence of joint effusion.  (Tr. 169.)

The joint examination showed no crepitus or restriction of range of motion.  Although slow,[3] no gait disturbances were noted, and she did not use an assistive device.  She had "good" muscle mass, tone, and strength.  (Tr. 169.)  Sensation was intact, although she reported "some" tingling in her left fingers, and grip strength was "significantly" diminished on the left (Tr. 169-70).   Dr. Vokoun's impression was hypertension, not adequately controlled with the administration of Atenolol, and fibromyalgia.  (Tr. 170.)  Dr. Vokoun noted that Johnson has not continued her recommended exercise, and that she would

---

[3]Johnson attributed her slow gait to back pain.  (Tr. 168.)

7

"definitely benefit from an exercise regimen" and counseling or a fibromyalgia support group. (Tr. 170-71.) He opined that her limitation towards work would be "significant" unless there was "something enjoyable that she found possibly with children or something to the extent where she can get her mind off of things and continue to work." (Tr. 171.)

On December 26, 2002, nerve conduction studies of the upper extremities revealed "mild" bilateral distal median neuropathies, greater on the right than on the left. (Tr. 186.)

On February 5, 2003, Johnson called requesting a different pain medication as she stated that the Trazodone was not helping her pain. (Tr. 184, 224.) On March 6, 2003, Johnson called asking permission to take samples of Bextra, an anti-inflammatory medication she had gotten from her sister. (Tr. 224.) On August 20, 2003, Johnson requested a refill of Bextra. (Tr. 225.)

On November 24, 2003, a magnetic resonance imaging (MRI) scan of the lumbar spine showed loss of hydration of the discs in the lower thoracic and lumbar levels, but there was no fracture, dislocation, or significant disc herniation detected. There was also straightening of the lumbar spine and "mild" narrowing at L5-S1. (Tr. 226.)

On April 27, 2004, Dr. Steier completed a Physical Capacities Checklist. He opined that Johnson could sit for thirty minutes at a time for a total of four hours in an eight-hour workday, and both stand and walk each for thirty minutes at a time for a total of one hour in an eight-hour workday. She could occasionally lift up to twenty pounds and occasionally carry up to ten pounds. She could occasionally push or pull up to ten pounds. Dr. Steier opined that Johnson could not do repetitive movement with her hands, arms, feet or legs in operating controls. (Tr. 219.) She could occasionally climb, reach forward and overhead, handle, and finger; however, she could not balance, stoop, kneel, crouch, or

8

crawl. Finally, he opined that she would have "moderate" restrictions in moving mechanical parts and operating automotive equipment, and "severe" restrictions with regard to working at unprotected heights.  (Tr. 220.)

Records show that on December 11, 2002, Johnson telephoned stating that she could not go to a scheduled consultative examination because she babysat her granddaughter every day.  This telephone call is significant because the call and the followup telephone conversation indicated that the child was a toddler and also that Johnson was caring for the young child daily. (Tr. 214.)

**Documentary Evidence Submitted to the Appeals Council**

Johnson's attorney submitted a letter dated December 28, 2004, as evidence to the Appeals Council.  The letter includes five specific findings made by the ALJ.  (Tr. 228-30.)

## THE ALJ'S DECISION

The ALJ found that Johnson was not "disabled" at any time through the date of his decision.  (Tr. 25, 26.)  The ALJ framed the issues as: 1) whether Johnson was entitled to disability benefits under the Act; and 2) whether Johnson was "disabled."  (Tr. 16.)

The ALJ followed the sequential evaluation process set out in 20 C.F.R. § 404.1520 to determine whether Johnson was disabled, considering any current substantial gainful work activity, the severity of any medically determinable impairment(s), and Johnson's residual functional capacity with regard to her ability to perform past relevant work or other work that exists in the national economy.  (Tr. 17.)

Following this analysis, the ALJ found that Johnson is not disabled.  (Tr. 25, 26.) Specifically, at step one the ALJ found that after March 7, 2001, the alleged onset date of disability, Johnson worked as a babysitter.  However, because Johnson earned only

9

approximately $250 per month the babysitting job was not considered substantial gainful activity.  (Tr. 17.)  At step two, the ALJ found that Johnson has the following medically determinable impairments that are "severe" within the meaning of the SSA's regulations: fibromyalgia; obesity; hypertension; and left eye blindness.  (Tr. 21.) At step three, the ALJ found that Johnson's medically determinable impairments, either singly or collectively, do not meet section 12.04 or any other section of Appendix 1 to Subpart P of the Social Security Administration's Regulations No. 4, known as the "listings." The ALJ noted that no treating or consultative physician reported findings equivalent in severity to any listed impairment.  (Tr. 18.)  At step four, the ALJ determined that, despite Johnson's medically determinable impairments, she possesses the residual functional capacity to perform sedentary work with the ability to: lift, push and pull ten pounds occasionally; to walk, stand, stoop and bend occasionally; and to sit frequently.  (Tr. 23.)

Finally, at step five the ALJ found that Johnson lacks the residual functional capacity to perform any of her past work.  (Tr. 23.)  In so deciding, the ALJ weighed Johnson's testimony, finding the testimony relating to her ability to work "not totally credible." (Tr. 19.) The ALJ also carefully considered the medical records submitted by treating physicians,[4] and the opinions of consultative physicians resulting in Physical Residual Functional Capacity Assessment forms (Tr. 20).[5]

---

[4]The ALJ noted that he gave less weight to medical records that preceded the alleged onset date of disability, March 7, 2001.  (Tr. 23.)

[5]The ALJ gave more weight to the January 2003, residual functional capacity than the June 2002, residual functional capacity because the latter residual functional capacity referenced objective medical evidence of record, including findings from the December 2002, consultative examination and Johnson's noncompliance with her medication regimen.  (Tr. 21-22.)

## STANDARD OF REVIEW

In reviewing a decision to deny disability benefits, a district court does not reweigh evidence or the credibility of witnesses or revisit issues *de novo*.  *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995); *Harris v. Shalala,* 45 F.3d 1190, 1193 (8th Cir. 1995).  Rather, the district court's role under 42 U.S.C. § 405(g) is limited to determining whether substantial evidence in the record as a whole supports the Commissioner's decision and, if so, to affirming that decision.  *Harris,* 45 F.3d at 1193.

"Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision."  *Holmstrom v. Massanari,* 270 F.3d 715, 720 (8th Cir. 2001). The Court must consider evidence that both detracts from, as well as supports, the Commissioner's decision.  *Id.*; *Morse v. Shalala,* 16 F.3d 865, 870 (8th Cir. 1994).  As long as substantial evidence supports the Commissioner's decision, that decision may not be reversed merely because substantial evidence would also support a different conclusion or because a district court would decide the case differently. *McKinney v. Apfel,* 228 F.3d 860, 863 (8th Cir. 2000); *Harris,* 45 F.3d at 1193.

## DISCUSSION

### "DISABILITY" DEFINED

An individual is considered to be disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  The physical or mental impairment must be of such severity that the claimant is "not only unable to do his previous work but cannot,

considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A). If the claimant argues that she has multiple impairments, the Act requires the Commissioner to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B).

## SEQUENTIAL EVALUATION

In determining disability, the Act follows a sequential evaluation process.  *See* 20 C.F.R. § 404.1520.  In engaging in the five-step process, the ALJ considers whether: 1) the claimant is gainfully employed; 2) the claimant has a severe impairment; 3) the impairment meets the criteria of the "listings"; 4) the impairment prevents the claimant from performing past relevant work; and 5) the impairment necessarily prevents the claimant from doing any other work.  *Id.*  If a claimant cannot meet the criteria at any step in the evaluation, the process ends and the determination is one of no disability.  *Id.*

In this case, the ALJ completed all five steps in the evaluation process, concluding: 1) Johnson has not performed substantial gainful activity since March 7, 2001; 2) Johnson has the following medically determinable impairments that are "severe" within the meaning of the SSA's regulations: fibromyalgia; obesity; hypertension; and left eye blindness; 3) Johnson's medically determinable impairments, either singly or collectively, do not meet the "listings"; 4) Johnson possesses the residual functional capacity to perform sedentary work with the ability to: lift, push and pull ten pounds occasionally; to walk, stand, stoop

12

and bend occasionally; and to sit frequently; and 5) Johnson lacks the residual functional

capacity to perform any of her past work.

The Court agrees with the Defendant that the issues in this case are whether the

ALJ: 1) performed a proper credibility determination; and 2) was correct in determining that

Johnson can perform work existing in sufficient numbers in the national economy.  (Filing

No. 12, at 10.)

### PLAINTIFF'S CREDIBILITY

Johnson argues that the ALJ did not properly apply the correct standard in

evaluating her subjective complaints of pain.  Relevant are 20 C.F.R. § 404.1520(e) and

Social Security Ruling 96-7p.  The underlying issue is the severity of the pain.  *Black v.*

*Apfel,* 143 F.3d 383, 386-87 (8th Cir. 1998). The ALJ is allowed to determine the

"authenticity of a claimant's subjective pain complaints."  *Ramirez v. Barnhart,* 292 F.3d

576, 582 (8th Cir. 2002) (citing *Troupe v. Barnhart,* 32 Fed. Appx. 783, 784 (8th Cir. 2002);

*Clark v. Shalala,* 28 F.3d 828, 830-31 (8th Cir. 1994)).  An "'ALJ may discount subjective

complaints of pain if inconsistencies are apparent in the evidence as a whole.'"  *Haley v.*

*Massanari,* 258 F.3d 742, 748 (8th Cir. 2001) (stating the issue as whether the record as

a whole reflected inconsistencies that discredited the plaintiff's complaints of pain) (quoting

*Gray v. Apfel,* 192 F.3d 799, 803 (8th Cir.1999)).

The *Polaski v. Heckler,* 739 F.2d 1320 (8th Cir. 1986), standard is the guide for

credibility determinations:

> While the claimant has the burden of proving that the disability results
> from a medically determinable physical or mental impairment, direct medical
> evidence of the cause and effect relationship between the impairment and
> the degree of claimant's subjective complaints need not be produced. The

13

adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them.

The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:

1. the claimant's daily activities;
2. the duration, frequency and intensity of the pain;
3. precipitating and aggravating factors;
4. dosage, effectiveness and side effects of medication;
5. functional restrictions.

The adjudicator is not free to accept or reject the claimant's subjective complaints *solely* on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole.

*Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1986).

An ALJ is required to make an "express credibility determination" when discrediting a social security claimant's subjective complaints. *Lowe v. Apfel,* 226 F.3d 969, 971-72 (8th Cir. 2000). This duty is fulfilled when an ALJ acknowledges the *Polaski* factors, and the ALJ has clearly examined the factors before discounting the claimant's testimony. An ALJ is "not required to discuss methodically each *Polaski* consideration." *Id.* at 972.

Regulations provide that the ALJ must consider all symptoms, "including pain, and the extent to which symptoms can reasonably be accepted as consistent with the objective medical evidence," defined as "medical signs and laboratory findings." 20 C.F.R. § 404.1529. Medical "signs" are defined as:

anatomical, physiological, or psychological abnormalities which can be observed, apart from your statements (symptoms). Signs must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are

14

medically demonstrable phenomena that indicate specific psychological abnormalities, *e.g.*, abnormalities of behavior, mood, thought, memory, orientation, development, or perception. They must also be shown by observable facts that can be medically described and evaluated.

20 C.F.R. § 404.1528(b).

"Laboratory findings" are defined as: "anatomical, physiological, or psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques. Some of these diagnostic techniques include chemical tests, electrophysiological studies (electrocardiogram, electroencephalogram, etc.), roentgenological studies (X-rays), and psychological tests."

20 C.F.R. § 404.1528(c).

Social Security Ruling 96-7p provides that a "strong indication" of the credibility of a claimant's statements is the consistency of the claimant's various statements and the consistency between the statements and the other evidence in the record.  Ruling 96-7p provides that the ALJ must consider such factors as:

* The degree to which the individual's statements are consistent with the medical signs and laboratory findings and other information provided by medical sources, including information about medical history and treatment.

* The consistency of the individual's own statements. The adjudicator must compare statements made by the individual in connection with his or her claim for disability benefits with statements he or she made under other circumstances, when such information is in the case record. Especially important are statements made to treating or examining medical sources and to the "other sources" defined in 20 CFR 404.1513(e) . . . . However, the lack of consistency between an individual's statements and other statements that he or she has made at other times does not necessarily mean that the individual's statements are not credible. Symptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time, and this may explain why the individual does not always allege the same intensity, persistence, or functional effects of his or her symptoms. Therefore, the adjudicator will need to review the case record to determine whether there are any explanations for any variations in the individual's statements about symptoms and their effects.

15

* The consistency of the individual's statements with other information in the case record, including reports and observations by other persons concerning the individual's daily activities, behavior, and efforts to work. This includes any observations recorded by SSA employees in interviews and observations recorded by the adjudicator in administrative proceedings.

SSR 96-7p, 1996 WL 374186 (S.S.A.) at *5 (July 2, 1996).[6]

Deference is generally granted to an ALJ's determination regarding the credibility of a claimant's testimony and, in particular, subjective complaints of pain. *Dunahoo v. Apfel,* 241 F.3d 1033, 1038 (8th Cir. 2001) (stating that if an ALJ provides a "good reason" for discrediting claimant's credibility, deference is given to the ALJ's opinion, although every factor may not have been discussed).

In Johnson's case, the record illustrates that the ALJ performed a thorough *Polaski* analysis in determining the credibility of Johnson's subjective pain complaints.   In making the credibility determination, the ALJ considered: Johnson's nonperformance of substantial gainful activity since March 7, 2001; discrepancies in the evidence with respect to Johnson's daily activities;[7] daily work activity babysitting a toddler after the alleged onset of disability; and discrepancies between Johnson's allegations of pain and the medical evidence of record.  (Tr. 18-20.)

---

[6]Social Security Ruling 96-7p is entitled: "Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements."

[7]Johnson's Daily Activities and Symptoms Report reflected that she cooked all of her meals daily, washed dishes and vacuumed, could drive for up to one hour, swept the porch occasionally, and could stand for at least one hour.  Her husband's form indicated that Johnson did few chores due to her pain.  (Tr. 18-19.)  Johnson's report is also inconsistent with her hearing testimony.  (*Compare* Tr. 100-04 *with* Tr. 258-59, 262.)

16

The ALJ summarized Johnson's complaints relating to her pain and its effect on her daily activities reflected, for example, in her Daily Activities and Symptoms Report (Tr. 18-19) and medical records (Tr. 19-20, 21.)  The ALJ, however, noted discrepancies within Johnson's own reports of her daily activities and those of her best friend and father. Therefore, contrary to Johnson's position, the ALJ did not base his decision with respect to Johnson's credibility solely on the fact that she babysits for a toddler on a daily basis. *See Pena v. Chater,* 76 F.3d 906, 908 (8th Cir.1996) (affirming the ALJ's discount of claimant's subjective complaints of pain, where the plaintiff cared for one of his children on a daily basis, drove a car infrequently, and occasionally went grocery shopping).

In summary, the ALJ thoroughly considered Johnson's subjective pain complaints, the reports of her primary treating physician, efforts with medication, reports of agency physicians, and Johnson's own statements.  The ALJ correctly engaged in the *Polaski* analysis.  The ALJ set out the standards stated in § 404.1529, and the ALJ acknowledged the *Polaski* standard as well as applicable regulations and SSR 96-7p.  (Tr. 30-31.)  The ALJ's conclusion that Johnson has the residual functional capacity necessary to perform sedentary work is well-founded, and followed an appropriate express credibility determination regarding Johnson's assertion of subjective complaints.  The ALJ's credibility decisions are well-supported and based on a thorough analysis of treating and consultative medical reports.

Therefore, the ALJ appropriately determined credibility issues with respect to Johnson's subjective complaints of pain.

17

**RESIDUAL FUNCTIONAL CAPACITY**

Residual functional capacity is defined as what Johnson "can still do despite . . . limitations." 20 C.F.R. § 404.1545(a). Residual functional capacity is an assessment based on all "relevant evidence," *id.*, including a claimant's description of limitations; observations by treating or examining physicians or psychologists, family, and friends; medical records; and the claimant's own description of relevant limitations. *Id.* § 404.1545(a)-(c).

The ALJ must determine residual functional capacity based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and the claimant's own description of relevant limitations. *McKinney v. Apfel,* 228 F.3d 860, 863-64 (8th Cir. 2000). Before determining residual functional capacity, an ALJ first must evaluate the claimant's credibility. In evaluating subjective complaints, the ALJ must consider, in addition to objective medical evidence, any other evidence relating to: a claimant's daily activities; duration, frequency and intensity of pain; dosage and effectiveness of medication; precipitating and aggravating factors; and functional restrictions. *See Polaski,* 739 F.2d at 1322; *see also* § 404.1529. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole. *Polaski,* 739 F.2d at 1322. A lack of work history may indicate a lack of motivation to work rather than a lack of ability. *See Woolf v. Shalala,* 3 F.3d 1210, 1214 (8th Cir.1993) (stating that a claimant's credibility is diminished by a poor work history). The credibility of a claimant's subjective testimony is primarily for the ALJ, not a reviewing court, to decide. *Pearsall v. Massanari,* 274 F.3d at 1218 (8th Cir. 2001).

In this case, the ALJ set out the language describing the appropriate standard under *Polaski* and § 404.1520. (Tr. 17.) The ALJ summarized Johnson's allegations of pain, and he described her daily activities according to the testimony and documentary evidence. (Tr. 18-19.) The ALJ found Johnson's testimony "not entirely credible." (Tr. 19.) The ALJ specifically considered, in addition to Johnson's testimony, documentary evidence including reports of treating and consultative physicians, a residual functional capacity assessment, and the testimony of a vocational expert ("VE"). The VE opined that Johnson has the residual functional capacity to perform sedentary work. Some examples of the types of jobs that Johnson could perform include a social worker, receptionist, cashier and interviewer. These jobs exist in significant numbers in the national economy. (Tr. 26.)

## OPINION OF JOHNSON'S TREATING PHYSICIAN

Also, an ALJ may resolve conflicts among various treating and examining physicians, assigning weight to the opinions as appropriate. *Pearsall v. Massanari,* 274 F.3d 1211, 1219 (8th Cir. 2001). "The [social security] regulations provide that a treating physician's opinion  . . .  will be granted 'controlling weight,' provided the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record.'" *Prosch v. Apfel,* 201 F.3d 1010, 1012-13 (8th Cir.2000) (quoting 20 C.F.R. § 404.1527(d)(2)). An ALJ may discount such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered an opinion inconsistent with other evidence as a whole. *Id.* at 1013; *Holmstrom,* 270 F.3d at 720. "The ALJ's function is to resolve conflicts among 'the various treating and examining physicians.'" *Estes v. Barnhart,* 275 F.3d 722,

19

725 (8th Cir. 2002) (quoting *Bentley v. Shalala,* 52 F.3d 784, 785, 787 (8th Cir. 1985)).

Whether the weight accorded the treating physician's opinion by the ALJ is great or small,

the ALJ must give "good reasons" for that weighting.  *Holmstrom,* 270 F.3d at 720*; Prosch,*

201 F.3d at 1013 (quoting 20 C.F.R. § 404.1527(d)(2)).

The ALJ considered the medical opinions of Dr. Steier, Johnson's primary treating

physician.  (Tr. 22.)  The ALJ also considered the opinions of Dr. Thakor, a rheumatologist

who saw and evaluated Johnson.  (Tr. 21.)  The ALJ also considered the opinions of

medical consultative physicians.  (Tr. 21-22.)  The ALJ gave "great weight" to the

consultative opinions because they were based on "objective medical evidence of record

. . . including findings from [Johnson's] December 2002 examination and [Johnson's] noted

noncompliance with medications."  (Tr. 22.)  The ALJ gave "significant, but not controlling"

weight to Dr. Steier's opinions because, although he was Johnson's treating physician, his

opinions were "not well-supported by medically acceptable and laboratory diagnostic

techniques" or "consistent with other substantial evidence of record."  (Tr. 22.)  The ALJ

illustrated in some detail the difference between Dr. Steier's opinion and the examining

physicians' opinions with respect to the issue of functional limitations.  (Tr. 22-23.)

This Court has carefully reviewed the record and agrees with the ALJ's summary

of Dr. Steier's opinions.  Those opinions are vague and differ significantly with much of the

additional medical evidence of both treating and consultative physicians, summarized

previously, as well as results of laboratory tests.  The ALJ evaluated Dr. Steier's opinions

appropriately.  The ALJ's conclusion that the treating physician's opinion was inconsistent

with evidence in the record as a whole is supported by substantial evidence.  *See*

*Dunahoo,* 241 F.3d at 1038 (finding that the treating physician's opinion was contradicted by the opinions of four other physicians).

## PLAINTIFF'S CONSULTANT

Johnson argues that the ALJ improperly rejected the opinion of David W. Utley, a rehabilitation consultant hired by Johnson.  Utley reviewed Johnson's social security file and interviewed her once.  (Tr.  129.)  Utley based his opinion that Johnson is unable to perform her past relevant work or any other work existing in significant numbers in the local or national economies was based on: Johnson's medical conditions; Johnson's reported symptoms; and Dr. Steier's opinions.  (Tr.  134.)  With respect to Utley's report (Tr. 129-134), the ALJ stated:

> The undersigned notes that disability opinions, such as those provided by Mr. Utley, are reserved for the Commissioner.  These issues must be determined by the Administration (Social Security Ruling 96-5p).  In addition, Mr. Utley has not been formally trained in the vocational factors and regulations of the Social Security Administration.  Consequently, he has not demonstrated that he is familiar with the "disability process" of the Administration and, therefore, his opinion has provided little probative value.

(Tr. 24-25.)

Johnson's argument that the ALJ incorrectly stated that Utley was not trained in the social security regulations is well-taken.  Utley's curriculum vitae states that in 1998-99 he was a vocational expert for the Social Security Administration.  (Tr. 135.)  However, the ALJ is responsible for making the residual functional capacity decision based on all "relevant evidence."  *Tellez v. Barnhart,* 403 F.3d 953, 957 (8th Cir. 2005).  Utley based his opinion in part on Johnson's subjective complaints of pain.  Johnson's testimony, however, was found not to be credible.  Utley also based his opinion on Dr. Steier's opinion, which was found to be inconsistent with the evidence as a whole.  Therefore, Utley's opinion

lacks a firm basis, and the Court agrees with the ALJ that Utley's opinion is entitled to little weight.

## CONCLUSION

For the reasons discussed, the Court concludes that the Commissioner's decision is supported by substantial evidence on the record as a whole and is affirmed.

IT IS ORDERED that the decision of the Commissioner is affirmed, the appeal is denied, and judgment in favor of the Defendant will be entered in a separate document.

DATED this 22nd day of June, 2006.

BY THE COURT:


s/Laurie Smith Camp
United States District Judge